UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
EBONY LOPEZ,                                        :
                                                   :
                        Plaintiff,                 :       **REPORT AND**
                                                   :       **RECOMMENDATION**
                                                   :
                                                   :       15-CV-5258 (PGG) (JLC)
            -v.-                                    :
                                                   :
CAROLYN W. COLVIN,                                 :
Acting Commissioner of Social Security,            :
                                                   :
                        Defendant.                 :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Paul G. Gardephe, United States District Judge:**

*Pro se* plaintiff Ebony Lopez seeks judicial review of a final decision by the

Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

The Commissioner has moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12(c), and Lopez has submitted no opposition.  For the

reasons set forth below, the Court recommends that the Commissioner's motion be

granted.

I.      **BACKGROUND**

        A.      **The Administrative Record**

                1.      <u>Lopez's Background</u>

        Lopez was born on July 23, 1982 and was 29 years old at the alleged onset

date of her disability on March 12, 2012.  Administrative Record ("R.") (Dkt. Nos.

11, 11-1, 11-2) at 180. As of the date of the Administrative Law Judge's ("ALJ")
hearing in December of 2013, Lopez lived with her two children (ages one and 13) in
an apartment in the Bronx. *Id.* at 38-39. Lopez obtained a bachelor's degree in
business administration from the College of Westchester in White Plains, New York
in 2012. *Id.* at 55.

## 2.   Alleged Disabilities

### a.   Physical Disability

Lopez claims that she injured her pelvis when she fell entering her car on
March 12, 2012. *Id.* at 57-58. She was hospitalized once for this condition from
May 16, 2012 to May 22, 2012 at Montefiore Medical Center ("Montefiore"). *Id.* at
212. During this hospitalization, Lopez complained of continuous pain in her pelvis
and side and an inability to walk. *Id.* at 213, 217. The hospital concluded that her
pelvic bone was not fractured, but rather that her pubic bone was likely separated
two degrees. *Id.* at 222, 225.

Lopez was subsequently evaluated by consultative examiner Dr. Barbra
Akresh on July 31, 2012 as part of her application for benefits.[1]  During the exam,
Dr. Akresh observed that Lopez appeared to be in pain, relied on a walker for
maximum support while walking (and could not walk without it), was unable to
walk on her heels or toes, could not change for the examination or get on the exam
table, and had difficulty rising from her chair. *Id.* at 236. Lopez reported that she

---

[1] Both of the consultative exams occurred less than two weeks prior to Lopez giving
birth on August 10, 2012. Due to the proximity of these exams to the birth of her
child, the ALJ concluded that they were of limited value. R. at 26.

2

could not do any cooking, cleaning, laundry, shopping, or provide child care due to her inability to stand. *Id.* She also stated that she had to sit down to take a shower, required assistance to get dressed, and spent most of her time watching television, reading, or listening to the radio. *Id.* Dr. Akresh concluded that there were marked limitations on Lopez's ability to engage in activities of daily living, as well as sitting, standing, walking, or carrying any objects (due to her need to use a walker). *Id.* at 238. At the time of Dr. Akresh's examination in 2012, a home aide was visiting Lopez five days per week for four hours each day. *Id.* at 246.

Lopez gave birth to a baby boy on August 10, 2012. *Id.* at 40. She was subsequently examined on September 4, 2012 by orthopedic specialist Dr. Evan Schwechter. He noted that she was still experiencing severe pain after the birth of her child and still had difficulty walking, but that she reported the pain had lessened since giving birth. *Id.* at 239. It was Dr. Schwechter's opinion that her pelvic pain was a natural result of her pregnancy and was a self-limiting condition that would heal with treatment as time passed. *Id.* at 241. He recommended Lopez be given pain medication to help her through the period of acute pain, and then start physical therapy when the pain subsided. *Id.*

In support of her application for a home health aide in May of 2013, her primary physician Dr. Randy Ross (who is associated with Montefiore where she was initially hospitalized in May of 2012) stated that Lopez had severe pelvic and lower extremity pain, could not walk without the assistance of her walker, and was a high fall risk. *Id.* at 268-69. This application was approved on May 20, 2013 and

3

provided for a home health aide to come to Lopez's home for 32 hours per week until November of 2013. *Id.* at 262.

b.     Mental Disability

Lopez also reports mental health problems, which were precipitated by her pregnancy. On April 24, 2012, Lopez went to Jacobi Medical Center ("Jacobi") "due to feelings of depression [and] homicidality towards her unborn child." *Id.* at 320-21. She said that she was "unable to control her feelings to get rid of her baby," and that she "attempted to cut her baby out of her body and her son (12) had to persuade her to stop." *Id.*[2] Lopez was transferred from Jacobi to Rye Hospital ("Rye") on April 25, 2012. *Id.* at 336. During her time at Rye, Lopez reported that she was experiencing major life stressors, including living in a house in foreclosure, a strained and allegedly abusive relationship with her estranged husband, and growing ambivalence about her pregnancy. *Id.* at 249-50. Lopez was discharged from Rye on May 1, 2012. *Id.* at 251. This was the only time Lopez was hospitalized for psychiatric-related issues.

As part of her benefits application, Lopez was evaluated by consultative examiner Dr. David Mahoney on July 31, 2012. *Id.* at 230. During that exam, Lopez claimed that she experienced crying spells, irritability, argumentative behavior, hopelessness, loss of interest, worthlessness, concentration difficulties,

---

[2] For a time, Lopez's 12-year-old son was removed from her home by child services and placed with his father due to Lopez's medical condition. *Id.* at 235. She subsequently regained custody of the child in August of 2012. *Id.* at 24.

4

and a diminished sense of self-pleasure and social withdrawal. *Id.* at 230-31. Dr. Mahoney further noted that Lopez's affect was depressed. *Id.* at 231. These observations led Dr. Mahoney to conclude that Lopez can follow and understand simple instructions and perform simple tasks independently. However, he also believed that she would have moderate difficulty concentrating, maintaining a regular schedule, learning new tasks, performing complex tasks, making appropriate decisions, relating to others, and dealing with stress. *Id.* at 232. Dr. Mahoney found that, taken together, these psychiatric problems "may interfere with the claimant's ability to function on a daily basis." *Id.* Dr. Mahoney diagnosed Lopez with severe major depressive disorder and anxiety disorder. *Id.* at 233. He did note, however, that these symptoms appear to be related to her pregnancy and may be resolved upon her having the child. *Id.* Other than a letter dated July 31, 2013 from psychiatrist Dr. Elizabeth Leimbach noting that Lopez missed an appointment, there is no further medical evidence in the record regarding Lopez's mental health. *Id.* at 272.

### 3.    Employment History

At the ALJ hearing, Lopez acknowledged that in 2012 she earned $15,475.00 from a laundry business that she operated from her apartment. *Id.* at 44. She testified that she ran the business, but hired someone else to pick up the laundry and then return it to clients once a third party cleaned it. *Id.* When asked whether she was currently engaged in the business (in December of 2013), Lopez answered that she ran the business, but employed one other person to pick up and drop off the

laundry to customers. *Id* at 45. According to Lopez, the business had between 50 and 100 customers, with approximately 15 being repeat customers. *Id* at 47-48. Lopez testified that in the early months of 2013 the business made $500 per month, but that she paid most of this revenue to her employee and that business slowed after she hurt herself in March. Lopez estimated that she made $3,000 in 2013 from the business. *Id*. at 50. When later asked why the business did not make $15,000 (similar to the amount it made in 2012), Lopez stated that the business ceased operating in May of 2013, which led the ALJ to conclude that Lopez had given conflicting testimony on the current state of the business. *Id* at 50-51.

In addition to running her own business during 2012, Lopez earned $1,541.75 that year working for the Robert Half Corporation. *Id*. at 154. According to Lopez, her duties there included reception, billing, and office administration. *Id*. at 52-53.[3]

As for 2013, earnings records demonstrate that Lopez earned $10,065 in self-employment income and $3,564 in income from the Robert Half Corporation. *Id*. at 5, 159.[4]

---

[3] Lopez's earnings in 2012 are substantiated by earnings records obtained by the Social Security Administration ("SSA") on March 31, 2015. *Id*. at 159. According to those records, Lopez earned $17,016.75 in 2012, which corresponds to $15,475 from the laundry business and $1,541.75 from the Robert Half Corporation. *Id*. at 154, 159.

[4] These figures also come from the earnings records obtained by the SSA. *Id*. at 159. The Court notes that these records reflect that Lopez earned $21,435.00 in 2014. *Id*.

6

### B. Procedural History

Lopez applied for DIB under Title II of the Social Security Act (the "Act") and SSI under Title XVI of the Act on June 14, 2012.[5] *Id.* at 133. In her application, Lopez alleged that she became disabled on March 12, 2012.[6] *Id.* at 137, 170. The SSA denied her application on September 18, 2012, and she filed a written request for a hearing with an ALJ on September 21, 2012. *Id.* at 18. A hearing was held before ALJ Robert C. Dorf on September 25, 2013. *Id.* at 34.

### 1. ALJ's Decision

In a written decision dated December 13, 2013, the ALJ found that Lopez engaged in substantial gainful activity from March 12, 2012 (the alleged onset date) until January of 2013. *Id.* at 20. Accordingly, Lopez could not be found disabled during that period, thus disqualifying her from receiving benefits. *Id.* at 21. Despite her inconsistent remarks regarding her work activity in 2013, the ALJ next determined that Lopez had not engaged in substantial gainful activity since January of 2013. *Id.* The ALJ then proceeded to engage in the relevant inquiry to determine whether Lopez was eligible for benefits. The ALJ concluded that Lopez had the impairments of pubic symphysis separation, migraines, and major depressive disorder. *Id.* However, the ALJ determined that none of these

---

[5] Though the application for benefits purports to be pursuant to Title XVIII, the Court believes this to be an error given that Title XVI applies to SSI benefits. *See* R. at 133.

[6] In the Complaint initiating this action, Lopez alleges her disability began in May of 2012. *See* Complaint ("Compl.") (Dkt. No. 2) at 1.

"conditions [are] so functionally limiting that she is unable to perform work on a sustained basis." *Id.* at 24.

In reaching this conclusion, the ALJ stated that he gave limited weight to Dr. Ross's (Lopez's primary physician) assessment because it only consisted of conclusory statements that were prepared in support of Lopez's request for home health services. *Id.* at 26. The ALJ also discounted the opinions of the consultative examiners because both the physical and mental examinations occurred less than two weeks before Lopez gave birth. *Id.* Instead, he gave greater weight to the opinion of orthopedic specialist Dr. Evan Schwechter, who believed Lopez's condition was self-limiting and expected it to resolve itself with conservative treatment. *Id.* The ALJ also relied on Lopez's role in running a business in 2012 and part of 2013 to support his conclusion that Lopez was not so functionally limited that she was unable to work. *Id.* Additionally, the ALJ relied on other facts elicited at the hearing to support his conclusion, including the fact that Lopez drives her car (which does not have an assistive device) five miles per week to the supermarket and to doctor's appointments. Further, she acknowledged that she walks around the neighborhood with the use of a cane and has to navigate up three flights of stairs to reach her apartment. *Id.* at 25.

Taking all of these factors into account, the ALJ concluded that Lopez's "subjective complaints of disabling symptoms cannot reasonably be accepted and the evidence does not establish that she is disabled within the meaning of the Social Security Act." *Id.* However, "[g]iving her the full benefit of the doubt, [the ALJ]

8

accommodated her gait limitations by limiting her to sedentary work, with no postural movements except occasional stairs . . . [and] limited her to low stress work, defined as no decision-making required, to accommodate symptoms that reasonably could be attributed to the mental impairment." *Id.*

Given these limitations, the ALJ found that although Lopez could not perform past relevant work, there were jobs that existed in significant numbers in the national economy that Lopez could perform, such as a ticket seller (1.6 million jobs nationally), document preparer (2.8 million jobs nationally), and addresser (96,000 jobs nationally). *Id.* at 26-27. Therefore, because the ALJ determined Lopez was capable of making a successful adjustment to other work that exists in significant numbers in the economy, he rendered a finding of "not disabled." *Id.* at 28.

### 2.    Appeals Council Decision

On June 9, 2015, the SSA's Appeals Council notified Lopez that it had granted her request to review the ALJ's decision. In that notice, the Appeals Council informed Lopez that it intended to issue a decision concluding that she was ineligible for benefits, but invited Lopez to submit additional evidence. *Id.* at 90-93. That notice specifically informed Lopez that the Appeals Council intended to rely on updated earnings records to determine Lopez had engaged in substantial gainful activity in both 2012 and 2013. *Id.* at 91.

On July 17, 2015, the Appeals Council issued its decision. *Id.* at 5. The Appeals Council agreed with the ALJ that Lopez had engaged in substantial gainful

activity from March 12, 2012 to January of 2013, thus disqualifying her from receiving benefits for that period. *Id.* However, it disagreed with the ALJ in his assessment of her employment from January of 2013 to December 13, 2013 (the date of the ALJ's decision). The Appeals Council concluded that the record reflected that Lopez engaged in substantial gainful activity during that period as well. This conclusion was based on a review of Lopez's updated earnings records (which had not been before the ALJ) and her testimony at the ALJ hearing. *Id.* These updated earnings records demonstrated that Lopez earned $13,629 in 2013. *Id.* Additionally, based on her testimony at the hearing, the Appeals Council determined Lopez owned and operated a home-based laundry business in 2013. *Id.* Accordingly, because Lopez had substantial gainful employment during all of 2012 and 2013, the Appeals Council concluded that Lopez "cannot be found disabled . . . from March 12, 2012, the claimant's alleged onset date, through December 13, 2013, the date of the [ALJ's] decision, regardless of the severity of her alleged impairments." *Id.* The decision of the Appeals Council constitutes the Commissioner's final decision.

### 3.  The Instant Action

On July 6, 2015, Lopez, proceeding *pro se*, filed a complaint seeking judicial review of the Commissioner's decision.[7]  The Commissioner filed an answer on

---

[7] Though Lopez filed the Complaint prior to the Appeals Council's final decision, the Commissioner has agreed to waive Lopez's failure to exhaust given that the Appeals Council rendered a decision shortly after the filing of the Complaint. *See* Def. Mem. at 3 n.5.

10

December 14, 2015 and moved for judgment on the pleadings. *See* Answer (Dkt. No. 10); Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Def. Mem.") (Dkt. No. 13). Lopez did not file an opposition to this motion.[8] This case was referred to me for a report and recommendation on July 22, 2015. (Dkt. No. 5).

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Decision

A claimant may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The reviewing court must determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U. S. 389, 401 (1971)).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting

---

[8] Other than filing the Complaint and her request to proceed *in forma pauperis*, Lopez has made no other filings in this case.

11

inferences can be drawn." *Id.* at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Where, as here, the plaintiff proceeds *pro se*, the Court must construe the pleadings liberally to raise the strongest arguments they suggest. *See, e.g., Lynn v. Comm'r of Soc. Sec.*, No. 13-CV-917 (CBA), 2013 WL 1334030, at *10 (E.D.N.Y. Mar. 30, 2013) (citation omitted). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to 'substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review.'" *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder *would have to conclude otherwise.*'" *Brault*, 683 F.3d at 448 (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.

1994)).

## 2.   Commissioner's Determination for Purposes of Eligibility

SSI is a federally funded, means-tested assistance program administered by
the SSA. *See* 42 U.S.C. § 1381 *et seq.* As such, "[n]ot all disabled persons are
eligible for SSI; such benefits are available only to those who have limited income
and resources." *Espinosa v. Comm'r of Soc. Sec.*, No. 13-CV-5456 (ER) (JLC), 2014
WL 5298019, at *4 (S.D.N.Y. Oct. 16, 2014) (quoting *Melville v. Apfel*, 198 F.3d 45,
50 (2d Cir. 1999)), *adopted by*, 2015 WL 1442399 (S.D.N.Y. Mar. 30, 2015).

To qualify for SSI by virtue of a disability, an individual must be unable "to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than twelve
months." 42 U.S.C. § 1382c(a)(3)(A); *see also Holloway v. Colvin*, No. 14-CV-5165
(RA) (HBP), 2016 WL 96172, at *9 (S.D.N.Y. Jan. 8, 2016). Moreover, physical or
mental impairments must be "of such severity that [the individual] is not only
unable to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the
national economy." 42 U.S.C. § 1382c(a)(3)(B); *see also Holloway*, 2016 WL 96172,
at *9.

### a.   Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step
inquiry. *See Cichocki v. Astrue*, 729 F.3d 172, 173 n.l (2d Cir. 2013) (quoting *Perez*

13

*v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Alicea v. Colvin*, No. 14-CV-1998

(CS)(PED), 2016 WL 452320, at *11 (S.D.N.Y. Feb. 4, 2016) (citing *McIntyre v.*

*Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)). First, the Commissioner must establish

whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R.

§ 416.920(a)(4)(i). If the claimant is engaged in substantial gainful activity, then

the Commissioner will find that the claimant is not disabled, "regardless of [her]

medical condition or [her] age, education, and work experience." 20 C.F.R.

§ 416.920(b); *see also Mora v. Comm'r of Soc. Sec.*, No. 13-CV-2253 (KAM), 2015 WL

4139341, at *14 (E.D.N.Y. July 9, 2015). If the claimant is not engaged in

substantial gainful activity, at the second step the Commissioner determines

whether the claimant has a "severe impairment" restricting her ability to work. 20

C.F.R. § 416.920(a)(4)(ii). If the claimant has a severe impairment, the

Commissioner moves on to the third step, considering whether the claimant has an

impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpart P. 20 C.F.R.

§ 416.920(a)(4)(iii).

 If the claimant's impairment or impairments meets the severity

requirements of a "listing," the Commissioner will find the claimant disabled. *Id.*;

20 C.F.R. § 416.920(d). If not, the Commissioner continues on to the fourth step to

determine whether the claimant has the residual functional capacity ("RFC") to

perform her past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). Finally, if the

claimant does not have the RFC to perform past relevant work, the Commissioner

completes the fifth step, ascertaining whether there are significant numbers of jobs

in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.  20 C.F.R. § 416.920(a)(4)(v).

The claimant bears the burden of proving disability in steps one through four of the analysis.  *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *see also Guilfuchi v. Comm'r of Soc. Sec.*, No. 14-CV-8207 (GWG), 2016 WL 128207, at *7 (S.D.N.Y. Jan. 12, 2016).  If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Selian*, 708 F.3d at 417.

b.    Substantial Gainful Activity

Substantial gainful activity involves any work, whether full or part-time, that is both substantial, in that it "involves doing significant physical or mental activities," and gainful, *i.e.*, "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 416.972.  In evaluating whether work constitutes substantial gainful activity, the SSA's primary consideration is the earnings derived from the work activity.  *See* 20 C.F.R. § 416.974(a)(1); *see also Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *13 (S.D.N.Y. July 22, 2015) ("'[D]emonstration of substantial gainful activity derives from an evaluation of an individual's earnings.'") (quoting *Rivera v. Barnhart*, 379 F. Supp. 2d 599, 605 (S.D.N.Y. 2005)).  If a claimant's earnings exceed the threshold amounts specified in the Commissioner's regulations, there is a rebuttable presumption that the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.974(b)(2)(ii);

15

*accord Surgeon v. Comm'r of Soc. Sec.*, 190 F. App'x 37, 39 (2d Cir. 2006); *Campbell*

*v. Astrue*, No. 12-CV-5051 (ADS), 2015 WL 1650942, at *17 (E.D.N.Y. Apr. 13,

2015).

    For calendar years 2012 and 2013, average monthly income in excess of

$1,010 (2012) and $1,040 (2013) presumptively indicated substantial gainful

activity.[9]  *See* 20 C.F.R § 404.1574(b)(2)(ii); *see also* Def. Mem. at 9 (citing SSA

Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (last visited

February 29, 2016)); Def. Mem. Ex. 1 (Dkt. No. 13-1).  The claimant "bears the

burden of establishing that despite surpassing the established level of earnings, she

was not engaged in substantial gainful activity." *Byrd v. Astrue*, No. 12-CV-2211

(JS), 2013 WL 4459040, at *10 (E.D.N.Y. Aug. 16, 2013) (citing *Figueroa-Plumey v.

Astrue*, 764 F. Supp. 2d 646, 650 (S.D.N.Y. 2011)); *see also Downes*, 2015 WL

4481088, at *8; *accord Surgeon*, 190 F. App'x at 39 (citation omitted).[10]

## B.    The Commissioner's Decision

    In his decision, the ALJ concluded that Lopez had engaged in substantial

gainful activity from March 12, 2012 (the alleged onset date) to January of 2013.  R.

at 20.  The ALJ relied on the fact that Lopez reported $15,475 of self-employment

---

[9] On an annual basis, these figures correspond to $12,120 in 2012 and $12,480 in
2013.

[10] "Factors that rebut a presumption of ability to work at the substantial gainful
activity level are Plaintiff's inability to perform work satisfactorily without more
supervision or assistance than is given other people performing similar work and
Plaintiff's need to work under special conditions." *Byrd*, 2013 WL 4459040, at *10
(citation omitted).

income in 2012 from a home-based laundry business. The ALJ stated: "I find that she worked continuously throughout 2012 as an owner and operator of a home-based business, which she ran for a profit, and for which she performed significant physical or mental activities. This work is substantial gainful activity." *Id*. at 21.

As for 2013, the ALJ concluded that despite her inconsistent statements at the hearing regarding her work activity, her reported earnings in 2013 (which she testified to be $3,000 at the hearing) did not meet the presumptive guidelines in the regulations for substantial gainful activity. *Id*. at 21. However, upon review of updated earnings records in July of 2015, the Appeals Council determined that Lopez had engaged in substantial gainful activity in 2013. It found that Lopez "has worked since at least March 12, 2012 through at least December 13, 2013, as an operator of a laundry service . . . This work activity involves significant physical or mental activities for pay or profit and constitutes substantial gainful activity within the meaning of the regulations." *Id*. at 5. This conclusion was based on a review of Lopez's earnings records, which indicated she earned $13,629 in 2013, which exceeds the $12,480 threshold that triggers the presumption. *Id*. Accordingly, the Appeals Council concluded that Lopez was not disabled from March 12, 2012 through the date of the ALJ's decision on December 13, 2013. *Id*.

## C.   Substantial Evidence Supports the Commissioner's Decision

There is substantial evidence to support the Commissioner's decision that Lopez was not disabled within the meaning of the Act since the date she filed her application. The record demonstrates that Lopez's 2012 and 2013 earnings

17

exceeded the SSA's threshold level for presuming substantial gainful activity. Lopez's earning records establish that she earned $15,475 in 2012 and $13,629 in 2013. *Id.* Both of these figures exceed the threshold that triggers a presumption that a claimant is engaged in substantial gainful activity ($12,120 in 2012 and $12,480 in 2013).

Lopez has submitted no evidence (either to this Court or the Appeals Council) to rebut the presumption that her earnings were sufficient to indicate substantial gainful activity. *See, e.g., Surgeon,* 190 F. App'x at 39; *Figueroa-Plumey,* 764 F. Supp. 2d at 650-51. Prior to issuing its decision, the Appeals Council notified Lopez that it intended to rely on updated earnings records to conclude that she had engaged in substantial gainful activity in 2012 and 2013 and invited Lopez to submit additional evidence. R. at 90-93. Lopez failed to do so. Moreover, because Lopez did not file any opposition to the Commissioner's motion for judgment on the pleadings, she has not directed the Court to anything in the record to rebut this presumption.

Furthermore, the Court has undertaken its own analysis of the record and finds insufficient evidence to rebut this presumption. Although Lopez testified at the ALJ hearing that her laundry business ceased operating in May of 2013 and that she only made $3,000 from the business in 2013, there was also contradictory testimony given at the hearing. R. at 50. For example, Lopez was asked if she was currently running the business, and she responded that "I run the business." *Id.* at 45. She further testified that "Just – at this time, I'm the owner." *Id.* at 46. The

18

ALJ highlighted this conflicting testimony, but nonetheless concluded that Lopez did not have substantial gainful employment in 2013. *Id.* at 21. However, with the benefit of updated earnings records in 2015, the Appeals Council reversed this determination. It relied on Lopez's reported income of $13,629 in 2013 to conclude that she was gainfully employed. This reported income is consistent with Lopez's testimony that she was still operating her laundry business in December of 2013, rather than her testimony that she ceased operating the business in May of 2013 and only earned $3,000 in 2013 from the business.

Exceeding this threshold, however, only gives rise to a presumption that Lopez engaged in substantial gainful activity. In this case, there is evidence to support the presumption that Lopez's laundry business constituted substantial gainful activity within the meanings of the regulations. The regulations define substantial work activity as activity that "involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). Gainful work activity is defined as activity "that you do for pay or profit." 20 C.F.R. § 404.1572(b). Lopez's laundry business constitutes substantial activity in light of the skills she employed. For example, she managed an employee, kept records for the business, and communicated with clients. R. at 45-49. In addition to her laundry business, Lopez worked for the Robert Half Corporation in 2013. Though it is unclear what services Lopez performed for the Robert Half Corporation in 2012 and 2013, she testified that from 2008 to 2010 she performed reception, billing, and administrative duties

19

for that business, which would also constitute substantial activity.[11] *Id.* at 52-53
*See Campbell*, 2015 WL 1650942, at *17 ("Moreover, the fact that she was employed
as a cashier from 1992 to 2001 . . . provides further evidence that the Plaintiff
acquired certain skills in her work that should be considered substantial gainful
activity."). Additionally, the business was gainful, as reflected by the revenue it
generated.

Further, there is no evidence in the record to suggest Lopez is unable to
perform work "satisfactorily without more supervision or assistance than is usually
given other people performing similar work." 20 C.F.R. § 404.1573(b).  Though the
ALJ limited Lopez's potential jobs to those involving only sedentary work, he did
not conclude that she would be treated differently than other employees performing
those same sedentary tasks. R. at 25.

In light of her hearing testimony and earnings records, the Appeals Council
reasonably concluded that Lopez engaged in substantial gainful activity from March
12, 2012 to December 13, 2013. As the Second Circuit has noted, "[i]n deciding
whether substantial evidence exists, [a court] defer[s] to the Commissioner's
resolution of conflicting record evidence." *Polynice v. Colvin*, 576 Fed. App'x 28, 30
(2d Cir. 2014) (citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

Because Lopez did not meet her burden at step one of establishing that she
was not engaged in substantial gainful activity, she is ineligible for benefits.  The

---

[11] Lopez earned $1,541.75 from the Robert Half Corporation in 2012 and $3,564 in
2013. R. at 154, 159.

Court therefore does not analyze the remaining steps of the five-step inquiry previously described.

## III.   CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be granted and the case be dismissed.

### PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

Dated: New York, New York
        March 1, 2016

JAMES L. COTT
United States Magistrate Judge

21

**A copy of this Report and Recommendation has been mailed to the following:**

Ebony Lopez
1034 E. 219th Street
Bronx, NY 10469